**James Harold REYNIERSON, Appellant,**

v.

**Nancy Merlyn REYNIERSON, Appellee.**

Court of Appeals of Kentucky.

June 21, 1957.

James F. Clay, Danville, Philip M. Lanier, Louisville, for appellant.

W. Earl Dean, William H. Phillips, Harrodsburg, for appellee.

MOREMEN, Judge.

This case presents the question of whether an action for alimony may be successfully maintained after an absolute divorce has been granted.

Appellant, James Reynierson, brought suit for divorce against his wife, Nancy Reynierson, appellee. Appellee filed answer, but set up no claim for alimony. After a judgment was entered granting to appellant an absolute divorce, appellee filed

a complaint in which she alleged that an oral contract had been made by which her husband had agreed to pay the sum of $200 per month as permanent alimony. The court adjudged appellee entitled to permanent alimony in the sum of $150 per month starting February 1, 1953, which date corresponds to the divorce decree.

■ As a general rule a divorce decree brings an end to litigation and an allowance of alimony cannot be had after a decree of divorce has been granted, particularly where the court had jurisdiction to award alimony, but failed to do so. Especially is this true where alimony was in issue on the hearing in the divorce suit and was omitted from the decree without fraud or mistake.

Permanent alimony was entirely unknown to either the early common law or the ecclesiastical law. Nelson on Divorce, 2nd Ed., Vol. II, Page 3. Early in the history of this state it was held that power to award permanent alimony existed although not provided for by statute—Butler v. Butler, 4 Litt. 201, 14 Ky. 201—and it was said:

"We, therefore, conceive that the chancellor, before the statute, and since, in cases not embraced by it, which have strong moral claims, had and has jurisdiction to decree alimony, leaving the matrimonial chain untouched, and that those authorities which decide in favor of such jurisdiction, ought to prevail."

In the Butler case the court pointed out that the very purpose for the development of powers of a court of equity was to "afford remedy where conscience and law acknowledges a right, but knows no remedy," but later we seem to have lost sight of the real reason for the establishment of equity courts and have been inclined to adhere to the rigid requirements of common law. In Campbell v. Campbell, 115 Ky. 656, 74 S.W. 670, it was said:

"While in this state alimony has not been regarded as an incident of the divorce, this is true only where the marital relation is continued. But where that relation is terminated without claim or reservation in the judgment of divorce concerning future support by way of alimony, all such rights of the parties must be deemed as fixed and settled by the judgment."

In Jones v. Jones, 284 Ky. 511, 145 S.W. 2d 90, in which the matter of alimony was in issue and proof was taken thereon and in which the judgment awarded maintenance for the children but was silent as to alimony, the court held that after the expiration of the term, the wife's only remedy was by appeal to the Court of Appeals or by action for a new trial upon statutory grounds. See also: Logsdon v. Logsdon, 204 Ky. 104, 263 S.W. 728; Lyon v. Lyon, 243 Ky. 236, 47 S.W.2d 1072.

However, in Hanks v. Hanks, 282 Ky. 236, 138 S.W.2d 362, 364, the husband sought a divorce and was granted one. No allowance was made for alimony. In a subsequent action brought by the husband seeking to adjust the property rights of the parties, the wife set up a counterclaim for alimony and in sustaining the right to counterclaim, this court said:

"Ordinarily, when a wife is granted an absolute divorce without seeking a judgment for alimony she is precluded from thereafter recovering it. But this rule should, and does, admit of the exception that when the question of alimony has not been litigated and the judgment of divorce does not contain an order of restoration as required by Section 425, Civil Code of Practice, and the husband subsequently by independent action seeks to recover property, the title to which at the time of the divorce was in the wife, the wife should be permitted to assert by counterclaim her right to alimony. Otherwise, an innocent wife might be deprived of property, the possession of which was the considera-

tion which induced her to forego her right to support."

Thus it may be seen that the court believed it possessed the power to avoid injustice by granting, in unusual circumstances, a remedy when a miscarriage of justice has occurred.

With these rules in mind we find it necessary to give a rather full statement of facts and to determine whether the situation presented warrants the granting of relief.

Mr. and Mrs. Reynierson had been married for more than twenty-eight years when, on April 3, 1952, he filed a petition for divorce. Mrs. Reynierson filed an answer which consisted mainly of a traverse. She requested no alimony. While the suit was pending and even on the day the judgment for absolute divorce was granted to the husband—January 10, 1953—the parties, through their attorneys, negotiated for a settlement of alimony.

It is apparent from the record that all parties assumed that if an accord could be reached, Mrs. Reynierson would assert no claim for alimony by way of amended answer. In fact, there is a strong indication in the record that Mrs. Reynierson and her attorney were trying to avoid a divorce.

During the interim period, the husband paid $200 a month to her and after the divorce was granted he made an additional payment of $200.

It appears that the attorney for the husband was authorized to make a settlement for permanent alimony in the sum of $200 a month, but Mrs. Reynierson was not disposed to accept that amount.

An unusual feature of the case was that Mrs. Reynierson's attorney, who does not represent her on this appeal, was an intimate friend of the family and had grown to maturity in close association with the Reynierson's son. This unique position offered an opportunity for him, working with the son, to settle the matter but, as we have said, Mrs. Reynierson was reluctant.

A hearing on the divorce was postponed several times, but eventually it was set for a day certain. The night before, Mrs. Reynierson was visited by her attorney who told her that Mr. Reynierson, through his attorney, had agreed to pay $200 a month permanent alimony. After about three hours discussion she agreed to accept the offer. Then her attorney testified that this happened:

"Ans. I returned to my home, went to bed; the next morning was the first Saturday in the term—Mr. Clay—there were several divorces set for that day, and I missed Mr. Clay that Saturday morning—I did not talk to him that morning; I did talk to Mr. Reynierson out here before the hearing.

"Q. State whether or not you had a conversation about that offer. Ans. I saw Mr. Reynierson—he was smoking —walking up and down the hall back here. I went back and spoke to him and told him I was glad we had the thing settled. He told me that I knew he would do what he had told his boy and me that he would do—I said—yes, I was sure he would, that was the extent of the conversation I had with him.

"Q. And what did you understand that to mean? Ans. That Mr. Reynierson knew about the offer, and I took it that he was saying he would do what he said he would do—that he would pay $200.00 a month to her.

"Q. What was that $200.00 a month to represent? Ans. To represent alimony, in lieu of cash settlement, and in lieu of a real property settlement.

"The Court; Let me understand you with regard to this last offer that you submitted to Mrs. Reynierson— Did you get that offer from Mr. Reynierson? Ans. No sir, from Mr. Clay—we understood it was the offer

Mr. Reynierson made—he had made that offer probably three weeks before Mrs. Reynierson agreed to accept it.

"Q. What was it Mr. Reynierson said when you told him? Ans. He said I knew that he would do what I (sic) had told me and his son that he would do. I said—yes I knew it."

Mr. Reynierson testified, when questioned, about the authority he had delegated his attorney, Mr. James Clay, as follows:

"Q. You told Mr. Clay, did you not, that it was going to be settled on a basis of $200.00 a month? Ans. No, sir.

"Q. Was anything said about an offer of $200.00 a month to your wife to Mr. Clay? Ans. No, sir, never did."

Mr. James F. Clay, when he testified, discussed the difficulties of the case and the confusion which resulted from the fact that Mr. Reynierson was talking to his son and to his wife's attorney about the settlement, and said: "I do not recall making the proposition to anyone and am sure that an offer to pay $200.00 was never made; that was the limit of my authority, and I was undertaking to get a settlement for less than that." Mr. Clay also testified that to his amazement the attorney for Mrs. Reynierson on the morning of the trial had told him that she wanted nothing and would not accept the offer which had been made and that she did not want anything. This bit of testimony, however, perhaps is explained by other testimony indicating that, during the course of negotiations, plans had been discussed which included the buying of a new Ford car for the wife and a division of the furniture.

The foregoing statements and excerpts have been lifted from the fabric of the testimony given by the witnesses and are subject to the usual criticism when threads of thought are removed from their context, but we have concluded, after scanning all the testimony given, that the processes of equity would be denied if we failed to give the appellee some relief in this case.

We agree with the chancellor that no contract in the strict sense of the word was achieved, but our problem here is not so much as to whether a crystal clear oral contract was proven but whether we are justified, under equitable principles, to utilize an exception from the general rule that a divorce decree brings an end to litigation. In the Hanks case, we did. In applying the theory of that case, the chancellor, in this case, said:

"It seems to me that in the present case the equities supporting the claim of Mrs. Reynierson to a right of alimony hearing are just as strong and as appealing as those in the Hanks case. She claimed no alimony because she believed he had contracted with her to pay her alimony. In so advising her, her attorney had acted in good faith, after dealing directly with her husband and his attorney, and in the belief that he had himself heard the offer made by counsel for Reynierson and had himself notified the latter of the acceptance. That in fact no contract was actually entered into, does not, in the circumstances of this case, impugn his good faith or indicate his misunderstanding resulted from negligence. I am convinced from the evidence that his misunderstanding was honest and genuine, just such a mistake as one might reasonably make when acting under the stress and strain he was in trying to get this alimony settlement worked out."

In addition, the court might well have relied upon Cooper v. Cooper, 314 Ky. 413, 234 S.W.2d 658, wherein a spouse was permitted to recover alimony in Kentucky after her husband had been granted a divorce by a Florida court.

We believe the chancellor's application is correct and that in this unusual

circumstance the wife was properly permitted to maintain a subsequent action.

We wish to comment with the assurance of "hindsight" that if appellee had brought this suit under CR 60.02, our problem would have been less difficult because clearly appellee permitted the original judgment to be entered without objection because of "mistake, inadvertence, surprise or excusable neglect," and perhaps relief might have been granted under subsection (6)· of that rule which grants relief for reason of an extraordinary nature. However, we have concluded that since substantive law, even before the adoption of the rule, provided relief in cases of this nature, appellee was not limited to that action alone.

Judgment affirmed.